# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

In re

**THE HOMESTEAD AT WHITEFISH LLC**,

Debtor.

Case No. **14-60353-BPH**

## MEMORANDUM OF DECISION

### I.  Introduction

In this Chapter 11[1] case, K2M, LLC, ("K2M") GFY87, LLC, ("GFY87" of "Plan Funder") Great Northern Ventures, LLC, ("Great Northern") PMJ, LLC, ("PMJ") Mark Kvamme, ("Kvamme") and Paul Johannsen ("Johannsen") (collectively, K2M, Great Northern, PMJ, Kvamme, Johannsen, are referred to as "Movants") request that this Court enforce the release, injunction, and other terms in The Homestead at Whitefish LLC's, ("Debtor") Second Amended Plan [of Reorganization] ("Plan"), which was confirmed on November 7, 2014.

A little more than a year after Debtors' Plan was confirmed creditors Don and Emily Maschmedt (the "Maschmedts") filed an action in state court.  In 2017, Maschmedts filed their First Amended Complaint asserting a litany of claims and requesting various forms of relief under different theories.  Maschmedts' claims relate back to and involve their purchase of Lot 1 in Debtor's failed real estate project in 2007.  The acquisition of Lot 1 was a prepetition transaction between Maschmedts and Debtor.  Maschmedts allege that they entered a stipulation

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

with Debtor in connection with confirmation of the Plan that "expressly reserved their right to pursue such litigation under the terms of the Plan."[2]   As a result, neither the release, injunction, exculpation or other terms in the Plan and Confirmation Order apply to them.

Movants filed 4 briefs at ECF Nos. 194, 232, 235, and 273.  Maschmedts also filed 4 briefs at ECF Nos.  202, 233, 234, and 274, each arguing increasingly divergent interpretations of the parties stipulated language, which the Court included in its Confirmation Order.[3] Generally, Movants argue that the language is very narrow, while Maschmedts essentially argue that neither the Plan, nor Confirmation Order have any effect on them or their prepetition claims against the Debtor.  A hearing was held on March 1, 2018.[4]

This dispute requires the Court to ascertain Maschmedts and Movants' intent when agreeing to the stipulated language and its effect on the parties' rights vis-a-vis the Plan, and Confirmation Order.  The Court's analysis requires consideration of Maschmedts' prepetition claims against the Debtor, the instruments that correspond to the underlying transaction between Maschmedts and Debtor, and ultimately a determination of whether Paragraph 35 broadly excluded Maschmedts from the Plan and Confirmation Order, or narrowly assured them that their ownership of Lot 1, and other real property interests would not be disturbed by the Plan.

---

[2] ECF No. 274.
[3] *See* Paragraph 35, Confirmation Order, ECF No. 162.
[4] There have been 2 contested evidentiary hearings on this matter in this case: one on October 31, 2017 related to whether this Court had jurisdiction, and a later hearing on March 1, 2018 to further address the merits of Movants' Motion.  At the March hearing, Maschmedts' Exhibits 2, 4, 6, 8, 9, 10, 11, 12, 13, 15, 16, 17, 19, 20, 23, and Movants' Exhibits 2, 3, and 6 were admitted. At the October hearing, Maschmedts' Exhibits 1-13, and Movants Exhibits 1-9 were admitted. For purposes of this Decision, the record includes the exhibits admitted at both hearings.

## II.  Jurisdiction

Maschmedts initially argued that this Court lacked jurisdiction because the "claims asserted within their First Amended Complaint do not present a close nexus to the Plan or Confirmation Order, and thus, are not related to the underlying bankruptcy.[5]  This Court concluded in a separate decision that it had jurisdiction.  The findings and conclusions in the Court's prior Memorandum at ECF No. 238, are incorporated by reference.

## III.  Factual & Procedural Background

### A.  Pre-petition Events.

#### 1.  The Homestead at Whitefish.

Debtor[6] acquired land and intended to develop a planned community known as the "Homestead at Whitefish."  According to marketing materials the community would provide the property owners with access to amenities.  The amenities included access to a concierge, a lodge style clubhouse, the Lewis and Clark cabins, Homestead Barn, an elaborate entrance to the community known as the "Hitching Post," the "Meadow at Chinook Lake" and Waterfall Park.  Property owners also had access to all terrain vehicles, (ATVs), snowmobiles and watercraft.

The original plan included development of forty, 20 acre lots, 300 acres of open space and common area, and 155 acres for future development. The Debtor planned to market and sell the 20 acre lots in four phases.  Beginning in 2005, 16 lots were marketed as part of the first phase.  Debtor sold 9 lots.  Only 7 of the 9 sales were to third-party purchasers, the other 2 lots were sold to Movant K2M.  The last sale occurred in December 2009.

#### 2.  The Covenants.

---

[5] ECF No. 202.
[6] Debtor's sole member was Great Northern.  K2M and PMJ were members of Great Northern. Kvamme has an interest in K2M and Johannsen has an interest in PMJ.

To accomplish Debtors' vision of a planned community with amenities, Debtor as the "Declarant" recorded a comprehensive Declaration of Covenants, Conditions, Restrictions and Easements, ("Covenants") in late 2005, almost 2 years before Maschmedts' acquired Lot 1.[7]  The Covenants were binding ("run with the land and will be binding upon all persons or entities having any right title or interest in all or any part of the Property (including Declarant))".[8]  The Covenants set forth certain obligations and duties of the parties.  Particularly relevant to this dispute are the covenants involving, the period of (a) Declarant Control, (b) the Association, (c) Common Area, (d) the amenities, (e) and Special Declarant Rights.

        a.  Declarant Control Period.

 Many provisions in the Covenants are discretionary, or capable of amendment during the period of Declarant Control.  Under the Covenants, the period of Declarant Control continued until "the earlier of December 2017, sale of 90% of the lots in each of the plats, or termination by the Declarant."[9]  On the petition date, the period of Declarant Control was still in effect because it had not been terminated, 90% of the lots had not been sold, and December 2017 was more than 3 years away.

        b.  Association, Cabins and Personal Property.

The Covenants established the Homestead at Whitefish Association ("Association").[10]  Each property owner was a member of the Association.[11]  All members in the Association were entitled to vote on Association matters, based on one vote per lot.[12]  Upon termination of the

---

[7] Maschmedt Ex. 4, Covenants § 1.4.
[8] *Id.*
[9] Maschmedt Ex. 4, Covenants §2.31.
[10] Maschmedt Ex. 4, Covenants § 4.1.
[11] *Id.*
[12] Maschmedt Ex. 4, Covenants § 4.4.

Period of Declarant Control, the Association was to be Declarant's successor and assume all of the rights, duties, and responsibilities of Declarant under the Covenants.[13]

Under the Covenants, the Association "may" acquire, hold, operate, and dispose of personal and real property including, dwelling units or "cabins."[14]  Owners and their guests could use the cabins in accordance with a reservation system, and payment.[15]  The system was permissive, and could be eliminated if the Association voted to dispose of the cabins.  Any decision to sell or otherwise dispose of the cabins required the consent of owners holding 67% or more of the votes of the Association.[16]

c.   <u>Common Area, "Cabins" and personal property.</u>

Common Area is defined as "any real property described in Exhibit B to the Covenants, and any other property in which the Homestead at Whitefish Owner's Association, Inc., owns an interest for the common use, benefit and enjoyment of some or all of the Members."[17]  On the date the Covenants were recorded, "Common Area" included the following:

> All private road and utility easements, utility easements, equestrian/pedestrian trail easements, and all other easements of any kind shown on Certificate of Survey No. 16496, records of Flathead County, Montana.[18]

Owner's Property Rights included, "a perpetual, nonexclusive easement for access to and from his Lot and for the use and enjoyment of the Common Area."[19]  Prior to expiration of the Period

---

[13] Maschmedt Ex. 4, Covenants § 5.13.
[14] Maschmedt Ex. 4, Covenants §§ 5.6 & 5.7.
[15] *Id*.
[16] *Id*.
[17] Maschmedt Ex. 4, Covenants § 2.9.
[18] Ex. B to Maschmedt Ex. 4.
[19] Maschmedt Ex. 4, Covenants §10.1.

of Declarant Control, Declarant could, but was not obligated to convey additional property to the Association to expand the Common Area.[20]

    d.  <u>Special Declarant Rights, Articles XVI and XX of the Covenants</u>.

During the period of Declarant Control the Declarant maintained exclusive control over the direction, size and scope of the project.[21]  Declarant had the right to withdraw from the Homestead at Whitefish property initially subject to the Declaration.[22]  As stated in Article XVI, "Declarant reserves the right to withdraw from the jurisdiction of these Covenants any parcel of the property provided however, that no parcel may be withdrawn after it has been conveyed to a purchaser."[23]  This broadly permits the Declarant to withdraw property subject to the Declaration.  Finally, the Declarant had the right after the sale of lots, but prior to expiration of the period of Declarant Control to terminate, extend, modify, amend or revoke the Declaration as to the whole or any portion of the Property, absent written objection by 80% or more of the property owners.[24]

    3.  <u>Maschmedts acquire Lot 1</u>.

    a.  <u>The Buy-Sell Agreement</u>.

Maschmedts executed a Buy-Sell Agreement dated August 27, 2007 for the purchase of Lot 1 ("Buy-Sell").[25]  The Buy-Sell includes a contingency for an inspection "for suitability of intended use," but it does not refer to any amenities, or include an amenity contingency.[26]  The

---

[20] Maschmedt Ex. 4, Covenants § 5.2.1.
[21] See §§ 11, Special Declarant Rights and Additional Reserved rights, and 11.1.2, Development Rights.
[22] Maschmedt Ex. 4, Covenants § 11.1.2(d).
[23] Maschmedt Ex. 4, Covenants § 16.4.
[24] Maschmedt Ex. 4, Covenants § 20.2.2
[25] *See* Proof of Claim 2-2.
[26] *Id*.

Buy-Sell includes an addendum that: (i) explicitly states that the property is being sold subject to the Covenants; (ii) Maschmedts reviewed the Covenants; (iii) telephone, electric power, and fiber optic cable had been provided to the property; (iii) Maschmedts received and reviewed a copy of the recorded Plat of the Homestead at Whitefish; and, (iv) Maschmedts were responsible for installation of a septic system and well.[27]  Maschmedts' Buy-Sell did not include a contingency for the completion of construction of any amenity.[28]

> ### b.  Maschmedts' Warranty Deed

A few months after the Buy Sell was signed, Debtor conveyed Lot 1 of the Amended Plat of Lot 1 & Open Space "A" of the Homestead at Whitefish Phase 1, together with a driveway easement to Maschmedts.[29]  The conveyance was by Warranty Deed ("Deed") and an exhibit to the Deed depicts the driveway.[30]  In addition, the driveway exhibit shows access to Lot 1 is accessed from Nixon Road by crossing Lot 2 via a shared driveway easement.[31]  The Deed covenants that Lot 1 is free from all encumbrances except, rights of way, notices, declarations, conditions, covenants, restrictions, by-laws, articles, certificates, plat notes and easements of record.[32]  The Deed does not explicitly refer to any amenities, or convey to Maschmedts the explicit right to use any amenities.

---

[27] *Id.*
[28] Compare agreements attached to Claim 2-2 and Proof of Claim 3-2.
[29] Movants' Ex. 2.
[30] *Id.*
[31] *Id.*
[32] *Id.*

4. <u>Amenities used by Maschmedts</u>.

Prepetition Maschmedts used cabins known as the Lewis and Clark Cabins, the snowmobiles, the watercraft, and ATVs, when they visited the Homestead.[33]  Occasionally, Don Maschmedt used the Bootjack Lake Lodge if he was visiting without his family.[34]

5. <u>Debtor cannot sell real estate post 2008</u>.[35]

As a result of the 2008 financial crisis, Debtor was unable to sell the remaining developed lots.  While the real estate market rebounded in other parts of the nation, prices for unimproved property failed to increase significantly in the area around the Debtor's real estate development, making it impossible for the Debtor to sell the lots without taking significant losses.  None of the lot owners made or proceeded with plans to improve their lots with homes and other improvements, which made it more difficult for the Debtor to raise capital to build out the property.  Buyers did not wish to purchase lots in empty developments and financers saw no momentum from buyers.  Prior to filings its petition, Debtor relied on significant cash infusions from Kvamme to continue to operate.

6. <u>The Lot Owners sue the Debtor.</u>[36]

As the pace of development slowed following the 2008 financial crisis, friction between the Debtor and the lot owners increased.  Ultimately, 5 of the 7 lot owners filed complaints against the Debtor in two separate lawsuits.  Only Maschmedts, and Alex Witherill did not file prepetition complaints against the Debtor and other defendants.  Generally, the complaints asserted claims for rescission, breach of contract, fraud, constructive fraud, negligent

---

[33] ECF No. 272, Transcript of Hearing 44; 11
[34] *Id.*
[35] ECF No. 105, ⁋12, A 1.
[36] ECF No. 105, ⁋12, A, 2-3.

misrepresentation, conversion, unjust enrichment, and diminution of property value, and sought compensatory and punitive or exemplary damages.  The claims centered on Debtor's failure to complete or provide various amenities that were referenced in the marketing materials.

    B.  Debtor's Bankruptcy.

        1.  The prepetion claims by the 7 lot owners.[37]

Debtor filed its petition under Chapter 11, March 31, 2014, shortly after the second complaint by a homeowner was filed.  Each of the 7 lot owners filed a proof of claim.[38]  With one exception, each lot owner's proof of claim was in the amount of their respective lot purchase price, and generally explained that their claim was premised on Debtor's failure to construct certain amenities.[39]  Maschmedts' filed  Proof of Claim 2-2 ("Claim 2-2") for $495,000, the purchase price of their lot.[40]  Claim 2-2 explains:

> Debtor promised and agreed to complete certain amenities, make improvements to and develop certain common areas of the Homestead Development at its own expense, and to make available to Claimants, the following amenities amongst others: a homeowner lodge, homeowner cabins, a gate house, access to bodies of water for swimming, fishing, canoeing, access to at least 300 acres of common area, including an extensive trail system, teepee village, family campout center, livery stable and corral, concierge service, high speed fiber optic cable, and various other easements and improvements (collectively the "Amenities").

> The Debtor has not completed or substantially failed to complete, and has not allowed access to many of the Amenities as agreed, represented or promised to Claimants.

Although not a party to one of the pending state court suits at that time, Maschmedts attached a copy of the pending complaint, and stated, "Claimants incorporate by this reference any and all claims referenced therein as if they were a plaintiff in that Complaint."[41]

---

[37] Under the Plan, these claims are defined as "Homeowner Claims."
[38] *See* proof of claims 1-2, 2-2, 3-2, 4-2, 5-2, 6-1, and 7-1.
[39] *Id.*
[40] Claim 2-2.
[41] *Id.*

2.   <u>The Plan, relevant terms, the release, injunction, exculpation</u>.

Debtor's Second Amended Plan ("Plan") recognized that the "Homestead at Whitefish" was a failure.[42]  Generally, the Plan provided for the winding down of the Debtor, sale of its assets and any assets owner by the Association, Debtor's dissolution (Article IV § A), dissolution of the Association (Article IV § J), and payment of allowed claims with the proceeds generated from the sale of assets.  The Plan included terms and provisions that addressed the mechanics of the assets sales, distributions under the Plan, closing and an effective date.  To assure the finality of the broad compromise and settlement of all claims against the Debtor or Debtor's property, the Plan included a release[43] and other specific language that protected the acquirer of property at the sale and parties responsible for implementing the Plan.

a.   <u>The orderly liquidation of Debtor's affairs</u>.

The Plan was dependent on the successful completion of 2 sales: the "Plan Funder Sale"[44]; and, the "Homeowner Sale."  Both of these terms were specifically defined in the Plan.[45]  In essence, Kvamme and/or K2M agreed to form an entity, the "Plan Funder," to purchase each of the homeowner properties through the Homeowner Property Sales.  The Plan Funder would also acquire the Debtor's property through the Plan Funder Sale.  Funds from the sale of Debtors' property to the Plan Funder were used to pay administrative and allowed claims.[46]

---

[42] ECF No. 129.
[43] The Plan includes 2 separate releases.  A broad "settlement, compromise and release," at Article VIII § A, and a separate release at Article VIII § F.  The release at VIII § F explicitly excludes Maschmedts.  The release at VIII § A does not include a specific exclusion of Maschmedts.
[44] Capitalized terms used in this Memorandum but not defined, have the same meaning ascribed to them in the Plan.
[45] *See* definitions Article I § A (50), (66).
[46] *See* Article IV, "Means for Implementation of the Plan."

Article IV of the Plan includes 13 separate sub-headings that outline the means of Plan implementation.  At confirmation, any assets owned by the Association were (shall) to be transferred to the Debtor.  At a closing after confirmation, the Plan Funder would acquire all assets of the Debtor (including the Association transferred assets) and complete the Homeowner Sales.[47]  Upon delivery of the cash payment to each of the Homeowner Claimants, each Homeowner would convey his or her respective Homeowner Property to the Plan Funder, free and clear of all liens and encumbrances.[48]  The effect of the 2 sales was a coordinated rescission of the lot sales to the individual homeowners and winding down of Debtor's affairs.  Total payments to the 6 participating Homeowner's was approximately, $2,202,500.

The motion requesting approval of the compromise under Rule 9019, explained:

> Don and Emily Maschmedt are not signatories to the Plan Term Sheet.  If the Maschmedts do not agree to the disposition of their Homeowner Property on the terms set forth in the Plan, their Homeowner Claims will be treated as Disputed Claims under the Plan, payment to Maschmedts at the closing with respect to their Homeowner Claims shall not be a condition to the Effective Date, and the Parties will seek confirmation of the Plan and the occurrence of the Closing and Effective Date for all other Claims as set forth herein.

Shortly after the Plan and the 9019 motion were filed, Maschmedts withdrew their proof of claim and objected to the Plan.[49]

Following closing, the Plan Funder was vested with the assets of the Debtor "free and clear of all Claims, Interests, Liens, encumbrances, charges, and other interests of Holders of Claims and Holders of Interests, except as otherwise expressly provided in the Plan."[50]  Further,

---

[47] The terms of the Homeowner Sales were the result of a compromise under Rule 9019 that was approved and incorporated into the Plan.  Maschmedts were the only homeowner that did not agree to the compromise.

[48] Article III § C (6).

[49] ECF Nos. 141 and 142.

[50] Article IV § E.

the Debtor and the Association were dissolved once the transactions were completed.[51]  The Plan

defined a vote by a Homeowner to accept the [Plan] as consent to the dissolution of the

Homeowners' Association.[52]  Finally, Article IV, explicitly states that the provisions of the Plan

shall constitute a good-faith compromise and settlement of all Claims, Interests, and

controversies resolved pursuant to the Plan.[53]

To underscore the finality of the transactions contemplated under the Plan, the Plan

included a broad release, injunction, and exculpatory clauses.[54]  These Plan provisions

unmistakably provide: that as of the effective date of the Plan, "Causes of Action" are

compromised, settled and released; any future action to enforce the causes of action that were

compromised, settled and released are prohibited and enjoined; and, the Exculpated Parties are

exculpated from liability for actions taken in connection with the chapter 11 case,

implementation and consummation of the Plan.[55]

### b.  The broad compromise, settlement and release under the Plan.[56]

The Plan effectuates a broad release and compromise of all claims.  Consistent with §

102(2), this release included claims against property of the Debtor.  Article VIII § A of the Plan

begins, "Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other

benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan

or in any contract, instrument, or other agreement or document created pursuant to the Plan, the

distributions, rights, and treatment that are provided in the Plan shall be in complete settlement,

---

[51] Article IV §§ A, J.
[52] Article IV § J.
[53] Article IV § H.
[54] Exculpatory clause is defined as, "a contractual provision relieving a party from liability resulting from a negligent or wrongful act."  Black's Law Dictionary 10th Edition (2009).
[55] Articles VIII §§ A, G, H.
[56] Articles VIII § A.

compromise, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever." Ultimately, the paragraphs 349 words incorporate a litany of defined terms, including "claims" and "causes of action." The use and incorporation of these defined terms has the effect of casting the broadest possible net over the prepetition activities and transactions of the Debtor and any conduct that may form the basis of a "Cause of Action" against Debtor.

The Plan's definition of "Causes of Action," includes "Claims" as that term is defined by § 101(a)(5) and highlights the expansive nature and scope of the Plan's compromise and release:

> any Claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law . . . .

The last sentence of the release states, "[T]he Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests, subject to the Effective Date occurring." This final sentence, along with the definitions and the expansive scope of the release evidence Debtor's intent that the Plan, and the outcomes achieved under the Plan enjoy finality.

c.   The injunction and exculpation provisions.[57]

Important to achieving finality after the effective date of the Plan are its injunction and exculpation provisions. Like the release, the injunction is comprehensive. Its 551 words, and reliance on other defined terms, provide that except as otherwise specifically provided in the

---

[57] Article VIII §§ G, H.

Plan or Confirmation Order, parties subject to Article VIII § A's broad compromise, settlement, and release of claims are permanently enjoined and excluded from a litany of activities after the effective date, including filing suit or pursuing in any manner, causes of action, claims, interests or liabilities that are within the scope of the release.

Each of the Movants is defined as an "exculpated party."  Similar to the release and injunction, the exculpation provision in this case assured the plan participants that they would not incur any liability attributable to their participation in the formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing or consummating the Plan.

      3.   <u>Maschmedts' Objection and its Resolution</u>.

Maschmedts simultaneously withdrew their proof of claim and objected to the Plan.[58] Maschmedts explained that the theory underlying their proof of claim was rescission.[59] Maschmedts were no longer interested in pursuing rescission because the purchase price proposed by Debtor and the Plan Funder was inadequate.[60]  Maschmedts outlined their expectations in their claim withdrawal:

> Maschmedts remain parties at interest in this case. They intend to object to the plan unless the plan or the order of confirmation makes it clear that plan confirmation does not affect Maschmedts' vested rights under the Declaration of Covenants, Conditions, Restrictions and Easements for The Homestead at Whitefish.[61]

Although Claim 2-2 identified rescission as its basis, this was not the singular basis for Claim 2-2.  In addition to rescission, Claim 2-2 also referred to breach of contract, fraud, constructive fraud, negligent misrepresentation, conversion, unjust enrichment, dimunition of property value,

---

[58] ECF Nos. 141 and 142.
[59] ECF No. 141.
[60] *Id*.
[61] *Id*.

unfair methods of competition and unfair or deceptive acts and practices, or other misconduct claims.

Maschmedts characterized their objection to the Plan as "limited."  In essence, Maschmedts objected to the Plan to the extent it effected a "rescission."  Maschmedts' explained that the their objection was limited to being compelled to sell their property known as Lot 1, Plat of The Homestead At Whitefish, Phase 1 to the Plan Funder and having their vested rights in common areas and amenities pursuant to the 'Declaration of Covenants, Conditions, Restrictions and Easements for the Homestead at Whitefish' to which their purchase of Lot 1 was subject abridged.[62]  Maschmedts reasoned in their objection that a forced sale under the Plan violated the takings clause of the Fifth Amendment of the U.S. Constitution.[63]  Despite their objection, Maschmedts explained, "if the Plan were modified to provide, or if the order confirming the plan provides that Maschmedts' ownership of Lot 1 and their vested rights pursuant to the Covenants are unaffected by the plan, then Maschmedts would be satisfied."[64]

The "Limited" Objection did not challenge: the Homeowner Sale, the Plan Funder Sale, transfer of Association assets to the Debtor for inclusion in the Plan Funder Sale, dissolution of the Association or the Debtor, the settlement, compromise and release of claims embodied in the Plan under Article VIII § A, injunction under Article VIII § H, or exculpation clauses under Article § VIII G, or other substantive terms of the Plan.  Maschmedts did object to any aspect of the Plan except compulsory participation in the "rescission" sales process at a sales price of $400,000 and loss of some unspecified right in common area or amenities.

---

[62] ECF No. 142.
[63] *Id*.
[64] *Id*.

15

Maschmedts entered a stipulation with Debtor and agreed to withdraw their objection to confirmation, on the condition that the order confirming the Plan included this language:

> Without limiting the effect of the relief provided in this Order and the Plan, nothing contained herein is intended to, or shall, limit or expand the property rights of Don and Emily Maschmedt with respect to their Homeowner Property, whether pursuant to the Declaration of Covenants, Conditions, Restrictions and Easements for The Homestead at Whitefish or otherwise.[65]

The Court approved the stipulation and entered an Order confirming the Plan on November 7, 2014.[66]  The parties stipulated language is included at Paragraph 35 of the Confirmation Order.[67]

    4.  <u>Confirmation of the Plan</u>.

Along with the parties' stipulated language, the Order confirming the Plan included 34 pages of detailed findings and conclusions that are difficult to reconcile with the positions Maschmedts are taking today.  The Court found that:

> [t]he Debtor and the Plan Funder will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby, (ii) take the actions authorized and directed by this Confirmation Order, and (iii) consummate the Plan Funder Sale and the Homeowner Property Sales. The Plan Funder is purchasing the Debtor's assets in good faith, and the Plan Funder has otherwise proceeded in good faith in connection with these proceedings.[68]

Other references to good faith and characterizations of the transactions as "arm's length" are included throughout the Court's findings.[69]  In addition to finding the parties were proceeding in good faith, the Court authorized the transactions concluding,  "Debtor is hereby authorized to

---

[65] ECF No. 158.  The stipulation does not refer to amenities, or the preservation of prepetition claims against the Debtor for amenities.
[66] ECF No. 161.
[67] ECF No. 162.
[68] Confirmation Order ¶ M.
[69] Confirmation Order ¶¶ E, F, H, J, K, M, O.

consummate, and shall be deemed to have consummated, the conveyance to the Plan Funder of all of its right, title and interest in, to and under the Debtor's assets . . ."[70]

The Confirmation Order provides that all persons and entities: "are forever barred, estopped and permanently enjoined from asserting against the Plan Funder, its successors, designees or assigns, its property, or the Debtor's assets conveyed in accordance with the Plan, such persons' or entities' Third Party Claims and Interests"[71]; and, that "the Plan Funder shall not be liable for any Third Party Claims and Interests against or in, or obligations of, the Debtor or any of the Debtor's predecessors or affiliates, as a result of having purchased the Debtor's assets."[72]  Other provisions in the Confirmation Order specifically conclude that the assets acquired by the Plan Funder are "free and clear" of the third-party Claims and Interests, except as provided in the Plan or this Confirmation Order.[73]

The Order explicitly addresses the dissolution of Debtor and Association.  The Order constitutes a decree of dissolution of the Debtor pursuant to Mont. Code Ann. § 35-8-902 and shall effect a dissolution of Debtor under Mont. Code Ann. § 35-8-901.[74]  For the Association, the Court concluded, "[a]ll requirements for dissolution of the Homeowners' Association pursuant to its articles of incorporation and by-laws and the laws of the State of Montana have been satisfied, and the Homeowners' Association shall be dissolved on the Effective Date."[75]  The dissolution of the Debtor and Association unquestionably represent the end of the "Homestead at Whitefish," and obligations Debtor had undertaken associated with it.

---

[70] Confirmation Order ⁋ 9(a).
[71] Confirmation Order ⁋ 10.
[72] Confirmation Order ⁋ 12
[73] Confirmation Order ⁋⁋ 8, 17
[74] Confirmation Order ⁋ 32.
[75] Confirmation Order ⁋ 33.

The Confirmation Order recognizes that the Plan reflects a broad global agreement between Debtor and various constituencies to compromise and settle their claims as part of the reorganization process.  It states:

> In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved under the Plan, and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.[76]

The Court explicitly found that release, injunction and exculpation provisions were an essential part of the compromise embodied in the Plan.

> . . . . . this Bankruptcy Court finds that such releases, exculpations, and injunctions set forth in the Plan and implemented by this Confirmation Order are fair, equitable, reasonable, and integral elements of the resolution of this Chapter 11 Case, are an essential component of the Plan Settlement Term Sheet, and are in the best interests of the Debtor and its estate, creditors and equity holders.  The releases of non-Debtors under the Plan are fair and are necessary to the Plan and are fair to holders of Claims and are given in exchange for and are supported by fair, sufficient, and adequate consideration provided by each and all of the parties receiving such releases. . . .

> . . . . . this Bankruptcy Court finds that the injunction, exculpation, and releases set forth in Article VIII of the Plan are consistent with the Bankruptcy Code and applicable law. The failure to implement the injunction, exculpation and releases would seriously impair the Debtor's ability to confirm the Plan.[77]

Later in the Order, the Court concluded, "the releases under the Plan constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan."[78]

Similarly, the Order authorizes and approves the Plan injunctions.  Except as otherwise expressly provided in the Order or the Plan, the injunction applies to "all Entities who have held, hold, or may hold Claims, Interests, causes of action, or liabilities that: (1) are subject to

---

[76] Confirmation Order ⁋ 23.
[77] Confirmation Order ⁋ L.
[78] Confirmation Order ⁋ 30.

compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan . . . ."[79]  Finally, the Order concludes:

> the Exculpated Parties shall neither have, nor incur any liability to any Entity for any postpetition, pre-final decree act taken or omitted to be taken in connection with the Chapter 11 Case, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan . . .[80]

Like the Plan, the Confirmation Order recognizes and authorizes the settlement, compromise and resolution of claims, authorizes the liquidation of Debtor's assets, and to protect the finality of the settlement, compromise and claims resolution effected by the Plan, creditors are enjoined from enforcing claims that are released, and parties responsible for the implementation and consummation of the Plan are exculpated.  Approximately 60 days after the Plan was confirmed, the sales transactions and disbursements contemplated under the Plan had been completed, and a final decree was entered.[81]

    C.  <u>Maschmedts' Post Confirmation Claims</u>.

    Just over 6 months after the Plan was confirmed, Maschmedts' counsel exchanged correspondence with Movants.  In the first letter, counsel explains:

> Maschmedts contacted and informed me that contrary to this Plan provision [Paragraph 35] they have been denied access to the amenities which were the inducement for them to purchase, for which they obtained a property interest and which were protected by agreement of all parties. . . .

> In reviewing the information that has been made available, it is clear that the Maschmedts are entitled to 45 days of use of cabins, and unlimited use of other amenities.  In return they are to contribute annually a total of $3,000.[82]

---

[79] Confirmation Order ⁋ 31.
[80] Confirmation Order ⁋ 27.
[81] ECF No. 181.
[82] Maschmedt Ex. 8.

In a second letter a few days later, June 15, 2015, Maschmedts claim that they expect to have

continued use of the following amenities on the following terms:

    (a)  Lewis and Clark Cabins, (both cabins), December 23 through January 2, 1 week in
          February, and July 1-6;
    (b)  Snowmobiles and ATVs, unlimited use during our stay at the cabins;
    (c)  Hitching Post, unlimited access year round;
    (d)  Livery Stable, unlimited access year round;
    (e)  Lake House and surrounding property, unlimited access year round, not to include
          overnight stays;
    (f)  Open Space, unlimited access year round.

(collectively for purposes of this dispute, items (a)-(f) are referred to as "Amenities").[83]  The

letter concludes, by characterizing Maschmedts' demand as a "proposal to provide them use of

amenities they bargained for several years ago."[84]  Debtor's counsel replied to the letter

explaining Maschmedts did not have a right to these amenities prepetition and the stipulated

language explicitly provides that Maschmedts' rights would not increase as a result of

confirmation."[85]

    D.  <u>Maschmedts' Complaint in State Court</u>.[86]

        Maschmedts' filed suit in December 2015, just over a year after confirmation.  After

filing their initial suit, Maschmedts waited 18 months, and filed an amended complaint May 3,

2017 ("First Amended Complaint").  Prepetition marketing materials were attached as Exhibit A

to the Amended Complaint.  Maschmedts' prepetition Buy-Sell was Exhibit B to the Amended

Complaint.  Prepetition Association board meeting minutes were attached as Exhibit C to the

Amended Complaint.  Finally, the First Amended Complaint also included a copy of the Plan

---

[83] Maschmedt Ex. 10.
[84] *Id*.
[85] Maschmedt Ex. 9.
[86] Maschmedt Ex. 11.

and letters from Maschmedts' counsel demanding access to Amenities, and Movant's response letter.

### IV. Analysis & Discussion

Generally, the provisions of a confirmed plan bind the debtor, any entity acquiring property under the plan, and any creditor, irrespective of whether the creditors' claims are impaired under the plan, or the creditor has accepted the plan. § 1141(a).  "Although confirmation of a plan generally acts as a final order ... a plan which is ambiguous as to a material term is subject to interpretation by a reviewing court."  *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir.2004).  Like a consent decree, a chapter 11 plan has elements of both a judgment and a contract. Because of a plan's likeness to a consent decree, a chapter 11 plan should generally be interpreted as if it were a contract." *In re Bartleson*, 253 B.R. 75, 78–79 (9th Cir. BAP 2000).  State law governs the interpretation of bankruptcy plans.  *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir.1993).

The Montana Supreme Court has repeatedly held, "[w]here the words [of a contract] are clear, certain, and unambiguous, the language alone [of the contract] controls."  *State v. Asbeck*, 2003 MT 337, ¶ 18, 318 Mont. 431, 80 P.3d 1272 citing *Morning Star Enterprises v. R.H. Grover* (1991), 247 Mont. 105, 111, 805 P.2d 553, 557.  However, if the language of the contract as a whole, could reasonably be subject to two different meanings an ambiguity exists. *Czajkowski v. Meyers,* 2007 MT 292, ¶ 21, 339 Mont. 503, 172 P.3d 94.  If the language of a contract is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract. *In re Marriage of Mease*, 2004 MT 59, ¶ 30, 320 Mont. 229, ¶ 30, 92 P.3d 1148, ¶ 30.

With the exception of Paragraph 35 of the Confirmation Order, the Plan and Confirmation Order are clear and unambiguous. As a result, this Court must determine whether Paragraph 35 is ambiguous, and whether that ambiguity renders the Plan ambiguous, because the "whole of a contract is to be taken together, so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." *Richards v. JTL Group, Inc.*, 2009 MT 173, ¶ 14, 350 Mont. 516, 212 P.3d 264.

Movants argue that Maschmedts' state court litigation violates the release, injunction, and terms of sale included in the Plan and Confirmation Order, causing harm to the Plan Funder and Movants.[87] Movants contend that Maschmedts have "cobbled together certain sections of the Plan" while ignoring others "to assert that the Plan as a whole has no impact on the claims of the Maschmedts."[88] Movants conclude that Paragraph 35 only preserves the Maschmedts' fee simple interest in their real property and property rights granted or evident in the Covenants. As a result, Paragraph 35 does not preserve the Maschmedts' ability to seek damages or equitable relief related to Debtor's preconfirmation failure to provide the amenities.[89]

Conversely, Maschmedts' rely on Paragraph 35 and urge this Court to interpret its language as an "explicit exclusion of Maschmedts' from the injunctions and releases included in the Plan and Confirmation Order."[90] Absent Maschmedts' broad interpretation of Paragraph 35 of the Confirmation Order, the finality of the Plan and its effect on Maschmedts' prepetition claims is irrefutable. Under the Plan, without considering Paragraph 35 of the Confirmation Order, Maschmedts claims set forth in Claim 2-2 would be compromised and settled. These

---

[87] ECF Nos. 194 and 232.
[88] ECF No. 235.
[89] *Id.*
[90] ECF No. 202.

claims would be released pursuant to Article VIII § A. The action in state court enjoined under Article VIII § H, and the state court action would be subject to dismissal. The arguments by both parties reflect and incorporate the parties' subjective analysis and interpretation of Paragraph 35, and more broadly the Plan and Confirmation Order.

Ordinarily, "[W]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible...." Mont. Code Ann. § 28-3-303. As explained by the Montana Supreme Court, "a conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation." *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 20, 338 Mont. 41, 50, 164 P.3d 851, 857. "The determination of whether an ambiguity exists in a contract is to be made on an objective basis." *Id*.

The Montana Supreme Court has held that the admission of extrinsic evidence of the circumstances under which [an instrument] was made, including the situation of the subject of the instrument and of the parties to it, may be considered to aid the court in determining, as a preliminary matter, whether the instrument contains an ambiguity." *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 53, 338 Mont. 41, 64, 164 P.3d 851, 866. This permits this Court to look beyond the Plan and Confirmation Order and consider the circumstances and subject matter of Paragraph 35 to determine whether Paragraph 35 is ambiguous.

The Montana Supreme Court has drawn a distinction between objective and subjective evidence in conjunction with the admission of evidence for purposes of determining if an

ambiguity exists in an instrument.  The *Mary J. Baker* Court adopted the rationale of the Seventh

Circuit which explained:

> [A contract] may be extrinsically ambiguous, being clear on its face but someone who
> knows the context of the contract would know that the contract means something other
> than what it seems to mean. In that situation, we distinguish between "subjective" and
> "objective" evidence of ambiguity. "Subjective" evidence of ambiguity is the testimony
> of the parties themselves as to what they believe the contract means, which is invariably
> self-serving, inherently difficult to verify and thus, inadmissible.... "Objective" evidence,
> on the other hand, is evidence of ambiguity that can be supplied by disinterested third
> parties, such as custom or usage of the trade. This kind of evidence is admissible because
> the ability of one of the contracting parties to fabricate such evidence is limited.

*Id.* citing *Home Ins. Co. v. Chicago and Northwestern Transp. Co.*, 56 F.3d 763, 768 (7th

Cir.1995).  Despite the distinction between objective and subjective evidence, this Court

admitted both objective instruments and allowed subjective testimony.

Objective evidence of the circumstances and subject matter of Paragraph 35 includes the

parties' prior filings in the case that resulted in Paragraph 35, along with the actual instruments

that define the parameters of Maschmedts' interest in the real property that was the subject of the

Plan Funder Sale, the Warranty Deed, and the Covenants. Maschmedts' Buy-Sell also offers an

objective insight into the underlying transaction.  The marketing materials and Association

meeting minutes highlight Maschmedts reliance on prepetition conduct of the Debtor to support

their claim to the Amenities.  Finally, although subjective, the testimony of Don Maschmedt

provided the Court with a critical insight.

A.  Evidence surrounding the circumstances and subject matter of Paragraph 35.

1.  The subject matter of Paragraph 35.

Maschmedts argue that taken together, the Covenants, their Deed, Buy-Sell, marketing

materials and Association meeting minutes establish their right to perpetual use of Amenities.

Under Montana law, any sale or transfer of real property (other than an estate at will or a lease

24

for a term less than one year) must be in writing and signed by the grantor. Mont. Code Ann. §§ 28-2-903, 30-11-111, and 70-20-101.  According to Maschmedts, this patchwork of documents from their prepetition transaction with the Debtor collectively establishes "Movants intended to provide perpetual rights to the Amenities as a collateral agreement to the sale of the real property and that the Maschmedts expected such perpetual rights to the Amenities."  This statement all but concedes that there is no instrument that conveys to Maschmedts the full panoply of rights, (i.e., Amenities), they assert in the property acquired by the Plan Funder.

     a.  <u>Buy-Sell</u>.

     The first written instrument Maschmedts executed in connection with their acquisition of Lot 1 was their Buy-Sell.  "One who executes a written contract is presumed to know the contents of the contract and to assent to those specified terms...." *Quinn v. Briggs* (1977), 172 Mont. 468, 476, 565 P.2d 297, 301.  Maschmedts' Buy-Sell does not refer to any amenities. Although it included a contingency for an inspection "for suitability of intended use," it does not refer to any amenities, or include an amenity contingency.[91]  If Maschmedts and Debtor had an agreement related to the perpetual use amenities and it was a material term of their agreement its exclusion from the Buy-Sell is peculiar.

     Instead, the Buy-Sell includes an addendum that: (i) explicitly states that the property is being sold subject to the Covenants; (ii) Maschmedts reviewed the Covenants; (iii) telephone, electric power, and fiber optic cable had been provided to the property; (iii) Maschmedts received and reviewed a copy of the recorded Plat of the Homestead at Whitefish; and, (iv)

---

[91]  Other lot owners made the completion of certain amenities a contingency in their agreement. Maschmedts' Buy-Sell does not include an amenity contingency.  Compare Maschmedts' Buy Sell Agreement to the Buy Sell attached to Proof of Claim 3-2 filed by David Littleton and Susan K. Stevenson.

Maschmedts were responsible for installation of a septic system and well.  These are the only special terms in Maschemdts' Buy-Sell.  There is not a single reference to amenities.

The Buy-Sell's silence on amenities is not dispositive.  "When a deed has been executed, the purchaser's rights are generally found in the deed covenants, not the executed contract." *Urquhart v. Teller*, 1998 MT 119, ¶ 28, 288 Mont. 497, 958 P.2d 714.  "It is a general tenet of contract law that all provisions in a contract for sale of real property are merged into the deed. *Id.*  However, there are exceptions to this general tenet.  For example, when the parties intended for some term or agreement to be collateral to the sale and not meant to merge with the deed.  The Montana Supreme Court has explained that, "[e]xamples of contractual arrangements that would not necessarily merge with the deed are restrictive covenants on land use or construction by the buyer.  *Thisted v. Country Club Tower Corp.* (1965), 146 Mont. 87, 405 P.2d 432, overruled, on other grounds, by *Gray v. Billings* (1984), 213 Mont. 6, 689 P.2d 268.  As a result, the Deed or Covenants may lend credence to a construction of Paragraph 35 extending to Amenities.

      b.  <u>Maschmedts' Deed</u>.

Maschmedts' Deed does not refer to amenities.  The construction of a writing granting an interest in real property, in turn, is governed by the rules of contract interpretation. *Whary v. Plum Creek L.P.*, 2014 MT 71, ¶ 10, 374 Mont. 266, 320 P.3d 973.  "A transfer of fee title or creation of lesser non-possessory easement or servitude by grant or reservation must generally occur in a signed writing identifying the grantor and grantee and which further includes language sufficient to both describe the fee or lesser interest conveyed or reserved and effect the conveyance." *O'Keefe v. Mustang Ranches HOA*, 2019 MT 179, 396 Mont. 454, 446 P.3d 509 (2019).  "A conveyance of real property by reference to a record subdivision plat, certificate of

survey (COS), or attached map incorporates the plat, certificate, or map into the instrument as if set forth therein in its entirety." *Id.*

The granting language in the Deed from Debtor to Maschmedts conveyed to Maschmedts Lot 1 of the Amended Plat of Lot 1 & Open Space "A" of the Homestead at Whitefish Phase 1, together with a driveway easement.[92]  The Deed includes an exhibit that depicts the driveway.[93] In addition, the driveway exhibit shows access to Lot 1 from Nixon Road by crossing Lot 2 via a shared driveway easement.[94]  The Deed covenants that Lot 1 is free from all encumbrances except, rights of way, notices, declarations, conditions, <u>covenants</u>, restrictions, by-laws, articles, certificates, plat notes and easements of record (emphasis added).[95]  Maschmedts accepted the Deed from Debtor, even though the Deed does not refer to amenities.  The Deed does not explicitly refer to any amenities, or convey to Maschmedts the explicit right to use any amenities.  However, Lot 1 was conveyed subject to the Covenants.

> c.  <u>Covenants</u>.

The Covenants do not grant or establish Maschmedts' had any perpetual or ongoing right in amenities.   "The same rules of construction apply to interpreting these prohibitive covenants as apply to interpreting contracts. Therefore, we must read the covenants as a whole in order to ascertain their meaning, rather than reading any one covenant or part of a covenant in isolation." *Gosnay v. Big Sky Owners Ass'n* (1983), 205 Mont. 221,227, 666 P.2d 1247, 1250 (internal citations omitted).  Here, the Covenants include numerous provisions.  A comprehensive reading of the Covenants shows that the Debtor as "Declarant" retained significant control over the

---

[92] Movants' Ex. 2.
[93] *Id.*
[94] *Id.*
[95] *Id.*

project through the petition date, and certain "rights" of the lot owners were subject to change if a requisite number of lot owners voted for a proposed action. Maschmedts' claim that the Covenants are representations or promises that equate to perpetual access to amenities finds no support in the Covenants.

Most importantly, the Covenants include specific provisions that allow for the termination, extension, or modification of the Covenants, as to the whole or any portion of the property during the period of Declarant Control, subject to a vote by the lot owners. Maschmedts briefing, arguments and alleged causes of actions fail to discuss or even mention, the almost unilateral control Debtor retained over the project as the Declarant during the Declarant control period. The procedures that allowed for Declarant control and voting by lot owners on proposed actions were in effect on the petition date.

i.   Declarant Control and Amendment.

Following expiration of the Declarant Control period, the Association would assume responsibility for Declarant's obligations under the Covenants.[96] This transition from Declarant Control to the Association is typical in planned unit communities. After a fixed date, or substantial completion of the project, the developer turns over control to the lot owners, typically through an "association." In this case, the Covenants establish the Declarant Control Period and turnover will occur, "the earlier of December 2017, sale of 90% of the lots in each of the plats, or termination by the Declarant."[97] On the petition date, the Declarant Control Period was in effect (it had not been terminated). As a result, the Debtor as Declarant was exclusively responsible for its obligations and duties.

---

[96] Maschmedt Ex. 4, Covenants § 5.13.
[97] Maschmedt Ex. 4, Covenants § 2.31.

After the sale of a lot, but prior to expiration of the period of Declarant Control, Declarant may terminate, extend, modify, amend, or revoke the Declaration as to the whole or any portion of the property.[98]  Absent objection by 80% of the lot owners after receipt of notice of the proposed action, the action shall be considered approved and become final.[99]  As a result on the petition date, Maschmedts rights under the Covenants were not fixed.  Instead their rights were contingent on the interests of the other lot owners and subject to being modified, amended or revoked as to the whole or any portion of the property.

ii.  <u>Common Area and Amenities</u>.

The Covenants defined the "Common Area" as:

All private road and utility easements, utility easements, equestrian/pedestrian trail easements, and all other easements of any kind shown on Certificate of Survey 16496, records of Flathead County, Montana.[100]

Although the "Common Area" could be increased, expansion was not required.  Instead, "additional common area may be created by the Declarant."[101]  "Prior to the expiration of the period of Declarant Control, Declarant may, but will not be obligated to, convey to the Association, other parts of the property as common area."[102]  Nothing in the Covenants states the Declarant will build, or convey to the Association a Hitching Post, Livery Stable, Lakehouse, or "Open Area."  To the extent these facilities were constructed, nothing in the record suggests the Hitching Post, Livery Stable, Lakehouse, or "Open Area" were located on Common Area established under the Covenants, or conveyed to the Association.  For example, Maschmedts did not introduce a deed showing real property with these facilities was ever conveyed or transferred

---

[98] Maschmedt Ex. 4, Covenants § 20.2.22.
[99] *Id*.
[100] Exhibit B to Ex. 4.
[101] Maschmedt Ex. 4, Covenants § 5.2.1.
[102] *Id*.

29

to the Association.  Further, even if the facilities were constructed that does not equate to a perpetual right to their use.

The Association "may" acquire, hold, operate, and dispose [sell] of personal and real property including, dwelling units or "cabins."[103]  Owners could use the cabins in accordance with a reservation system, and payment.[104]  Any decision to dispose or sell the cabins required the consent of owners holding 67% or more of the votes of the Association.[105] These are the only clauses within the Covenants that discuss cabins or other personal property that might be used as amenities.  The Covenants state the Association "may" rather than "shall" own the personal property or cabins.  "May" is defined as "to be permitted to," or "to be a possibility."  Black's Law Dictionary, 10th Ed. (2009).  Neither permission nor possibility are synonymous with a right or interest in perpetuity.  Nothing in the Covenants establishes either Debtor or the Association had an affirmative obligation to provide Amenities of any sort.

Maschmedts' letter to the Plan Funder asserted a perpetual right to use the Lewis and Clark cabins, snowmobiles and ATVs, the Hitching Post, Livery Stable, Lake House and Open Space.  The Covenants do not explicitly state that lot owners will have a perpetual right to use these specific amenities.  Instead, the Covenants contemplate property owners may have access to cabins or personal property through the Association.  The Association was not obligated to own any property in perpetuity, and pursuant to § 5.7, the Association could vote to sell any cabins it held.  As a result, on the petition date, the Association could, by majority vote, elect to

---

[103] Maschmedt Ex. 4, Covenants §§ 5.6 & 5.7.
[104] *Id*.
[105] *Id*.

transfer, or sell any property it held to the Debtor, or anyone else.  Not a single provision in the

Buy-Sell, Deed or Covenants supports the representations or demand in counsel's letter.[106]

> d.  <u>Marketing materials and Association meeting minutes.</u>

The marketing materials refer to amenities and establish that prepetition the Debtor used

amenities to sell real estate.  If Debtor had been capable of selling more than 7 lots, Debtor may

have realized its vision for the completed development, including amenities.  At the expiration of

the Declarant Control period, those amenities may have been transferred to the Association.

Instead, the project was never completed, and Debtor filed bankruptcy.  While the marketing

materials may form the basis of prepetition claims against the Debtor, the marketing materials do

not establish Maschmedts had a right to perpetual use of amenities on the petition date.  When

considered in a light most favorable to Maschmedts the marketing materials support their

prepetition claims for monetary damages described in Claim 2-2.

Maschmedts introduced various Association documents, including minutes from

Association meetings.  Nothing in these exhibits establishes any continuing right by Maschmedts

in either the real or personal property acquired by the Plan Funder.  Instead, the minutes reflect

"discussions" that occurred at Association meetings.  "Discussions" are not conveyances of

interests in real estate, or promises to provide amenities in perpetuity.  These minutes reflect the

prospective actions of a real estate developer and the existing lot owners, but do not equate to, or

guarantee any outcome.  Instead, the marketing materials and Association minutes demonstrate

Maschmedts' "new" claims are their prepetition claims against the Debtor.

> 2.  <u>The circumstances related to the parties' agreement and stipulated language that
> became Paragraph 35 in the Confirmation Order.</u>

---

[106] Maschmedts' enjoyed a perpetual, nonexclusive easement for access to and from their Lot
and for the use and enjoyment of the Common Area pursuant to § 10.1 of the Covenants.
Maschmedts have not alleged that they have been denied access to their Lot or Common Area.

Consideration of the circumstances between October 29, 2014, when Maschmedts filed their objection to the Plan, and November 5, 2014, when Maschmedts and the Debtor filed the stipulation that resolved their objection to the Plan, is critical to interpreting Paragraph 35 and determining whether it is ambiguous. According to the "Limited Objection" Maschmedts:

> . . . . object to Debtor's Second Amended Plan to the extent that it purports to compel the Maschmedts to sell their property known as Lot 1, Plat of The Homestead At Whitefish, Phase 1 ("Lot 1") to the Plan Funder or to abridge Maschmedts' vested rights in common areas and amenities pursuant to the Declaration of Covenants, Conditions, Restrictions and Easements. . . . The plan is objected to on the grounds that these provisions are not authorized by law and represent a taking of property for private use in violation of the Fifth Amendment to the United States Constitution.

ECF No. 142. In essence, the objection had 2 components. First, Maschmedts objected to the compulsory sale of their property at a sales price they found objectionable. Second, loss of access to common area or amenities which Maschmedts' characterized as "vested rights."

Maschmedts' choice of language in their Limited Objection is telling. The "limited" Objection did not challenge: the Homeowner Sale, the Plan Funder Sale free and clear of all claims, transfer of Association assets to the Debtor for inclusion in the Plan Funder Sale, dissolution of the Association or the Debtor, the settlement and compromise of claims embodied in the Plan, the release, injunction or exculpation clauses. Maschmedts did object to any aspect of the Plan, except compulsory participation in the Homeowner Sales at a sale price of $400,000 and loss of some unspecified right in common area or amenities.

Consistent with the Limited Objection, Maschmedts volunteered that it could be resolved with an equally limited assurance that "Maschmedts' ownership of Lot 1 and their vested rights pursuant to the CC&R are unaffected by the plan." Maschmedts' did not indicate that their objection could be resolved with an assurance that all causes of action attributable to Debtor's failure to provide amenities shall be unaffected by the Plan, or that Maschmedts will be explicitly

excluded from the injunctions and releases included in the Plan and Confirmation Order.  The Limited Objection does not hint at any successor liability claim against the Plan Funder, or other Movants attributable to amenities.

The day after Maschmedts filed their Limited Objection to the Plan, the Court approved a compromise under Rule 9019 between Debtor and every lot owner except Maschmedts.  As a result, the Plan was supported by every lot owner, except Maschmedts.  Consistent with the broad support the Plan enjoyed from the lot owners, every lot owner except Maschmedts voted to accept the Plan.  The Amended Ballot Report shows each of the following lot owners voted for the Plan: Forsees; Ruxins; Littleton and Stevenson; Witherall; Brock; and Delagnes.[107]  The day after the Amended Ballot Report was filed, Maschmedts and Debtor filed their Stipulation resolving the objection.  The ballots cast by the lot owners in favor of the Plan reflect the majority of voting members in the Association supported Debtor's proposed winding down of the "Homestead at Whitefish," the dissolution of the Association and rescission of the property sales.

The Plan explicitly set out the effect of voting.  "A vote by a Homeowner to accept the Plan shall such Homeowner's consent to the dissolution of the Homeowners' Association."[108]  Relevant to Maschmedts, the Plan explained:

> and such Homeowner's vote to reject the Plan shall be deemed rejection of the disposition of his or her Homeowner Property as set forth in Schedule 1.  If such Homeowner votes to reject the Plan and thereby does not agree to the disposition of his or her Homeowner Property as set forth in Schedule 1, such Homeowner's Class 6 Claim shall be treated as a Disputed Claim hereunder, the purchase price for such Homeowner's Homeowner Property shall be deposited into the Disputed Claims Reserve on the Effective Date, and payment to such Homeowner with respect to his or her Class 6 Claim shall not be a condition to the Effective Date.

---

[107] ECF No. 157.
[108] Confirmation Order ¶ T.

A rejection vote triggered other provisions of the Plan, but it did not completely remove Maschmedts' from the Plan, preserve litigation or claims, or otherwise have the effect suggested by Maschmedts.  Further, consideration of the Plan acceptances as "votes" for purposes of the Association and Covenants, demonstrates Maschmedts' negotiating position was weak.

This analysis of the voting is important because it shows that when the stipulation resolving their objection was filed, Maschmedts negotiating position was anemic, particularly as it related to the second part of their objection involving "rights in common areas and amenities" under the Covenants.  Each lot owner was a member in the Association.  Under the voting procedures outlined in the Covenants, 1 vote was allocated to each "lot," for voting purposes.  If a lot had multiple owners, the vote allocated to that lot could be cast only by agreement of a majority of the owners.[109]  According to the Covenants, sale or disposition of cabins owned by the Association required a vote in favor, by 67% of the owners holding the votes in the Association.  So long as less than 80% of the lot owners did not object, the Debtor as Declarant had the right to terminate, extend, modify, amend or revoke the Covenants as to the whole or any portion of the property after the sale of lots during the period of Declarant Control.

Under the 1 vote per lot regime of the Covenants, there were 7 total votes allocated 1 each to: Forsees; Ruxins; Littleton and Stevenson; Witherall; Brock; Delagnes; and, Maschmedts.  Based on the ballot report, 85.7% (Forsees, Ruxins, Littleton and Stevenson, Witherall, Brock, Delagnes), of the lot owner votes were in favor of selling Association property, and otherwise dissolving any Association.  This satisfied the 67% voting requirement under the Covenants.  Perhaps more importantly, to the extent the Plan sought to terminate, extend, modify, amend or revoke the Covenants as to the whole or any portion of the property after the

---

[109] Maschmedt Ex. 4, Covenants § 4.4.

sale of lots, but during the period of Declarant Control, only 14.2% of the votes objected to it (Maschmedts), while 85.8% (Forsees, Ruxins, Littleton and Stevenson, Witherall, Brock, Delagnes) voted in favor of it.  In effect, at the time the stipulation was filed, every voting member of the Association, except Maschmedts recognized that the promises of the Debtor would never be realized because the "Homestead at Whitefish" was a failed real estate project. From 2005 to the petition date it only sold 7 lots to third-party purchasers.

Finally, the voting is important because it highlights the absurdity of Maschmedts' position.  Maschmedts would be incapable of taking the position they are asserting in this case under non bankruptcy law.  Under the Covenants Maschmedts' alleged interest in a "cabin" for example, was contingent on the interests and votes of the other lot owners in the Association. The Covenants do not establish a regime that permits a solitary lot owner to impose their will on the Declarant, or other lot owners, and insist that cabins be provided in perpetuity.  Instead, the voting regime accepted by Maschmedts when they acquired their lot was one under which any decision by a majority of lot owners was binding on the minority voting lot owners.  The mere filing of the bankruptcy by Debtor should not afford Maschmedts an opportunity to obtain an outcome that was never achievable under non bankruptcy law and the Covenants, (i.e., perpetual use of a cabin or other amenities).

B.  Subjective Evidence of Maschmedts' intent when agreeing to Paragraph 35.

The only evidence in the record that Maschmedts' had a right to perpetual use of the Amenities without regard to the Declarant Control period, or the votes of the other lot owners is Don Maschmedts' testimony.  Although subjective, the Court allowed Don Maschmedt and Paul Johannsen to testify regarding the circumstances and the parties' intentions regarding Paragraph

35.  Maschmedt testified that upon receipt of the draft stipulation from Debtor's counsel, he had

the following understanding:

> And so for me, I'm naturally assuming that my property rights included everything that I paid for. Because, again, I did not buy 20 acres in the woods; I bought 20 acres at The Homestead. So my property rights included all of those things, and I used all those things for seven years. All of the marketing material said that they were my property rights, I had no reason to believe otherwise, so I felt comfortable signing off on this. [110]

Maschmedt did not testify that he is relying on specific language in his Deed as the basis of his

post confirmation claims.  Similarly, he did not testify or pinpoint a provision in the Covenants

that supported his position.  Instead, according to the testimony, his understanding was premised

on his assumptions.[111]  These assumptions were based on prepetition representations by Debtor,

or its agents, and the conduct of the Debtor and Association.  Not a single written instrument

establishes Maschmedts' alleged interest in Amenities was anything more than a prepetition

claim against Debtor.

---

[110] Transcript of Hearing, ECF No. 272; 53:13-20.  Maschmedts included this quotation in their briefing, but eliminated the introductory, "And so for me, I'm naturally assuming that. . ."  In their brief the quote is:

> [M]y property rights included everything that I paid for. Because, again, I did not buy 20 acres in the woods; I bought 20 acres at The Homestead. So my property rights included all of those things, and I used all those things for seven years. All of the marketing material said that they were my property rights, I had no reason to believe otherwise, so I felt comfortable signing off on this.

ECF No. 274.

[111] In response to questioning, Maschmedt used "assume" or "assumption" at least 12 times. *See* Transcript of Hearing, ECF No. 272; 21:13; 51:15; 53:13; 72:24; 73:25; 81:9; 81:23; 96:15; 97:12; 97:15; 104:19; 106:5; 120:25; 121:7; 121:12.

C.  <u>The circumstances and subject matter of Paragraph 35 permit the Court to conclude Paragraph 35 is not ambiguous</u>.

This Court is obliged to read the Plan and Confirmation Order as a whole, and endeavor to give effect to every part if reasonably practicable, each clause helping to interpret the other. Based on this review, Paragraph 35 is not ambiguous.  The objective and subjective evidence support finding and concluding that Paragraph 35 is not ambiguous.  This Court is unpersuaded that Maschmedts' broad interpretation of Paragraph 35 is correct, because the evidence does not support such an interpretation and it does not account for the "whole" Plan or Confirmation Order. Instead, the consistent thread in Maschmedts' analysis is their isolated focus on limited phrases or terms, while ignoring other provisions or terms that are inconsistent with their theory of the case.  Maschmedts' analysis defies applicable Montana law that commands the whole of a contract is to be taken together and effect given to every part if reasonably practicable, each clause helping to interpret the other.

The best indicia of the parties' intent leading up to the stipulation is the "Limited Objection" and Maschmedts' admission that the objection could be resolved with an equally limited assurance.[112]  It would be illogical to conclude that the parties would stipulate to preserve rights and interests (some of which never existed)[113], or completely "carve" Maschmedts out of

---

[112] Maschmedts' Limited Objection reflects Maschmedts and Debtors recognition that Maschmedts could not be compelled to sell Lot 1 for $400,000.  Similarly, Maschmedts must have recognized that by reaching an agreement with every other lot owner, Debtor had effectively marginalized their opposition to the Plan.  Although Maschmedts' could not be compelled to sell their property for $400,000, virtually every other aspect of the Plan was not objectionable to Maschmedts, as illustrated by their "Limited Objection."

[113] The Court has indulged Maschmedts' claims regarding amenities and scoured the record for any indicia that these claims enjoy factual support, have legal merit and were intended to be preserved for prosecution post confirmation.  Any claim Maschmedts had to amenities was premised on the prepetition representations and conduct of Debtor or its agents.  The claims were

the Plan to resolve such a Limited Objection.  Further, the drafter of the Plan specifically excluded Maschmedts from the release at Article VIII § F.  If Paragraph 35 was intended to exclude Maschmedts from Articles VIII §§ A, H, G, and other material Plan provisions, it is reasonable to conclude that the stipulation resulting in a paragraph 35 would have done so explicitly.  Instead, Paragraph 35 is limited because the objection was limited.  The only component of Maschmedts' objection that had any merit was their objection to participation in a compulsory sales process that required them to sell Lot 1 to the Plan Funder.

Maschmedts' evidence centers on their prepetition transaction with Debtor and alleged promises made regarding amenities.  Maschmedts' analysis ignores the Deed, Covenants, or even the circumstances that led to the stipulation.  Instead, Maschmedts argue that the definitions in the Plan are critical to their interpretation, and direct the Court to specific terms, such as "Homeowner Property."  The Plan defines "Homeowner Property" as: "The real property owned by a Homeowner that is the subject of a Homeowner Claim." The Plan further defines the term "Homeowner Claim" as: "a Claim asserted by the owner or owners of real property located on or adjacent to property owned by the Debtor for, or in any way related to, the Debtor's (a) sale of such real property, or (b) compliance with or fulfillment of promises to such owners that relate in any way to their ownership of such real property."

Maschmedts reason that because Paragraph 35 states, "nothing contained herein is intended to, or shall, limit or expand the property rights of Don and Emily Maschmedt with respect to their Homeowner Property," that Paragraph 35's scope extends to the preservation of their prepetition claims against the Debtor, and further stands for the proposition that the Plan

---

prepetition claims that entitled Maschmedts to monetary damages.  Those claims or the right to litigate those claims was not preserved under Paragraph 35.

Funder assumed successor liability for those claims. This Court cannot discern any support for this argument in the record. Nothing in the definitions or in the record supports Maschmedts' interpretation, that use of the defined term "Homeowner Property" was deliberately intended by the drafter to preserve prepetition claims against the Debtor, for assertion against the Plan Funder or other Movants, or more broadly carve Maschmedts out of the entire Plan.

Don Maschmedt did not testify that he requested Paragraph 35 include the defined term "Homeowner Property" because he wanted to preserve his prepetition claims and litigation against the Debtor for prosecution post confirmation against the Plan Funder, or other Movants.[114] To the contrary, Paragraph 35 was drafted by the Debtor's counsel. After reviewing the draft, Maschmedt did not request any changes. Maschmedts' broad interpretation premised on selected definitions and passages is untenable. The record without exception, shows there was a discrete objection to confirmation that was resolved by an equally discrete stipulation that resulted in Paragraph 35. The suggestion that Debtor's counsel, after securing the support of every other lot owner would resolve a discrete objection by drafting language that carves Maschmedts out of the Plan entirely and permits Maschmedts to seek relief that if permitted would undermine the broad "rescission" and wind down effected by the Plan is baseless, factually and legally.

There is no basis in the record to conclude that Paragraph 35 "expressly reserved [Maschmedts] right to pursue such litigation under the terms of the Plan," as Maschmedts state in one of their briefs.[115] The subject matter and circumstances surrounding Paragraph 35

---

[114] According to Johannsen, the Plan Funder would not have agreed to provide amenities to the Maschmedts in perpetuity. Transcript of Hearing, ECF No. 272, 176; 1-5.

[115] ECF No. 274.

demonstrate it is not ambiguous and was intended by the parties to be limited to preservation of Maschmedts' fee simple interest in their real property and property rights granted or evident in the Covenants.  This interpretation is consistent with Maschmedts' Limited Objection to being compelled to sell Lot 1 and participate in the rescission process effected by the sale.  Paragraph 35 did not preserve Maschmedts' prepetition claims against the Debtor or operate as a broad carve out of Maschmedts from the Plan.

Paragraph 35 is limited, consistent with the limited scope of the objection it resolved. The parties agreed that Maschmedts would be excluded from a compulsory sales process and Maschmedts would retain Lot 1.  As a result, Paragraph 35 is limited to neither an expansion or diminution of Maschmedts' rights in Lot 1 and any associated rights Maschmedts enjoyed attributable to their Deed.  This would extend to the Amended Plat referred to in their legal description, and the Covenants, including the Common Area described on Exhibit B.  Under the Plan and Paragraph 35, if the Plan Funder prevented Maschmedts from accessing their driveway, or denied them access to Common Area post confirmation, Maschmedts' would resolve that claim in state court.  Based on the record presented to this Court, a post confirmation cause of action between Maschmedts and the Plan Funder would be based on an instrument, not the prepetition representations of Debtor.

D.  <u>The causes of action asserted in the First Amended Complaint violate the Plan, its broad settlement and release, the injunction, exculpation provisions, as well as other findings and conclusions</u>.

Having concluded that neither the Plan nor Confirmation Order are ambiguous, and only a narrow interpretation gives effect to the whole, the First Amended Complaint must be dismissed.  "[A] chapter 11 bankruptcy case 'comprise[s] all matters pertaining to the debtor-creditor relationship that [the debtor] or any creditors might ... raise[ ] to advance their interests

in the proceeding'." *In re Wolfberg*, 255 B.R. 879 (9th Cir. B.A.P. 2000) citing *In re Kelley*, 199 B.R. 698, 702 (9th Cir. BAP 1996).  As explained in *Great Lakes Higher Educ. Corp. v. Pardee* (*In re Pardee*), 193 F.3d 1083, 1086 (9th Cir.1999), "If a creditor fails to protect its interests by timely objecting to a plan or appealing the confirmation order, it cannot later complain about a certain provision contained in a confirmed plan, even if such a provision is inconsistent with the Code."  Section 1141(a), "precludes a creditor from asserting, after confirmation, any other interest than that provided for it in the confirmed plan."  *In re Wolfberg*, 255 B.R. 879 (9th Cir. B.A.P. 2000) citing *In re Evans*, 30 B.R. 530, 531 (9th Cir. BAP 1983).  Maschmedts' First Amended Complaint asserts claims and interest that greatly exceed the narrow real estate interests Paragraph 35 preserved.  Paragraph 35 did not preserve Maschmedts' prepetition tort, contract or statutory claims for damages or equitable relief.  Paragraph 35 was never intended to permit Maschmedts' to launch a broad collateral attack on the Confirmation Order.

    1.   The Maschmedts' reliance on prepetition marketing materials, a Buy-Sell, and Association board minutes demonstrate the First Amended Complaint asserts prepetition claims that were fairly and reasonably contemplated by Maschmedts as evidenced by their proof claim.

With few exceptions, the causes of action included in the First Amended Complaint were released by Maschmedts.  Under the Code, "Claim" is defined broadly and encompasses all of a debtor's obligations, "no matter how remote or contingent."  *In re SNTL Corp.*, 571 F.3d 826, 838 (9th Cir. 2009).  Federal law determines when a claim arises under the Bankruptcy Code. *SNTL Corp.*, 571 F.3d at 839.  In the Ninth Circuit, courts use the "fair contemplation" test to determine when a claim arises. *Id*.  "[A] claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under non bankruptcy law." *Id*.  Many of the causes of action mirror, duplicate or overlap the claims

asserted in Claim 2-2, undermining their arguments that the causes of action alleged in the First Amended Complaint, "accrued post confirmation."

In Claim 2-2, the Maschmedts claimed $495,000 in pre-petition damages for Debtor's failure to provide amenities.  Claim 2-2 also incorporated a prepetition state court complaint asserting many of the same causes of action now asserted by the Maschmedts in their First Amended Complaint.  Claim 2-2 includes an addendum that explains:

> In connection with the Contract Documents, the Homestead Documents and the representations referenced above, the Debtor promised and agreed to complete certain amenities, make improvements to and develop certain common areas of the Homestead Development at its own expense, and to make available to [the Maschmedts], the following amenities, among others: a homeowner lodge, homeowner cabins, a gate house, access to bodies of water for swimming, fishing, canoeing, access to at least 300 acres of common area, including an extensive trail system, teepee village, family campout center, livery stable and corral, concierge service, high speed fiber optic cable, and various other easements and improvements (collectively, the "Amenities"). The Debtor has not completed or substantially failed to complete, and has not allowed access to many of the Amenities as agreed, represented or promised to [the Maschmedts] and other owners who purchased lots in the Homestead Development from the Debtor. …

These allegations were the basis of Claim 2-2.  A close review of Claim 2-2 and the First Amended Complaint demonstrate many of the causes of action in the First Amended Complaint are premised on this same nucleus of facts.

The causes of action asserted in the First Amended Complaint are premised on a combination of prepetition activity by the Debtor, allegations regarding the bankruptcy and Movants actions following confirmation.  Despite the inclusion of allegations regarding the bankruptcy and activity post confirmation, at the heart of the First Amended Complaint are the same claims Maschmedts delineated in Claim 2-2.  For example, the allegations at ¶¶ 16-22 of the First Amended Complaint (allegations related to representations regarding amenities and Maschmedts' reliance on those representations), closely align with the statement Claim 2-2 that,

"Debtor promised and agreed to develop the Homestead Development and provide numerous amenities."

In Claim 2-2, Maschmedts explained, "Debtor has not completed or substantially failed to complete and has not allowed access to many of the amenities as agreed to Claimants and other owners who purchased lots in the Homestead." This mirrors the allegations at ⁋ 30 of the First Amended Complaint. Under "Facts Common to All Counts" in the First Amended Complaint, ⁋⁋ 12-29 are allegations involving prepetition conduct of the Debtor. The allegations at ⁋⁋ 30-41of the First Amended Complaint relate to the bankruptcy proceedings.[116] Notably, allegations involving post confirmation conduct are limited to just 6 of the 145 numbered paragraphs in the First Amended Complaint.[117] These allegations recite the letter Maschmedts' counsel sent to the Plan Funder, the Plan Funder's response and allegation that the Plan Funder "has continued to deny Maschmedts access to the Amenities in which they are entitled to use."[118]

---

[116] Many of the allegations included in the First Amended Complaint that characterize the effect of the bankruptcy are, in this Court's view, misleading both in their characterization of the legal effect of the bankruptcy and their omission of significant relevant facts that are inconsistent with Maschmedts' theory of their case. Initially, this Court found Maschmedts' emphasis on Article VIII, § F compelling, but after reading the "whole" plan and scouring the docket to familiarize itself with the proceedings, it concluded that Maschmedts' initial emphasis on Article VIII, § F and other limited snippets of the record, this argument, and others were misleading. This Court will not speculate on whether this was deliberate, or counsel's failure to fully familiarize themselves with the entirety of the Plan, Confirmation Order and proceedings that preceded it.

[117] *See* First Amended Complaint, ⁋⁋ 41-47.

[118] Based on the record before this Court, counsel's letter was dubious. Under facts similar to those in this case, the Ninth Circuit affirmed the District Court's grant of summary judgment to condominium owners who sued the owner of an adjacent resort for shutting down the resort and maintaining the golf course for his personal use. The plaintiffs claimed that an implied easement, created when the original developers sold the condominiums and lots, gave them a right to pay for access to the resort. The plaintiffs also claimed that the resort owner violated the promises made by the original developers to finish the roads and water and sewer facilities and breached the contract made when he purchased the resort. *See Crystal Lakes Condo. Clubhouse Unit Ass'n v. Smith*, 1997 WL 154104, (9th Cir.). In that case, the defendant did not have the

43

Claim 2-2 included references to breach of contract, negligent misrepresentation, fraud, constructive fraud, unjust enrichment, conversion and consumer protection action claims. Each of these claims is alleged against the Debtor and some combination of Movants as co-defendants in the First Amended Complaint. Without exception, each of these counts relies on some combination of allegations involving alleged misrepresentations by the Debtor or Debtor's agent, and Maschmedts' Buy Sell.

In addition to being duplicative, the First Amended Complaint asserts new claims that make no allowance for Debtor's intervening bankruptcy, the Plan or the Confirmation Order. Maschmedts' allege:

> The transfer to GFY87, LLC was a distribution by the Homestead at Whitefish LLC [Debtor] to its member, Great Northern in liquidation. As such, Great Northern is responsible for all obligations of Homestead at Whitefish LLC [Debtor] upon its liquidation.[119]

This allegation seeks to impose successor liability on movant GFY87 directly arising from their participation in the implementation of the Plan. It violates Article VIII § G. And,

> That all actions and inactions of Homestead at Whitefish LLC [Debtor] were made by its sole member and manager, Great Northern, which in turn were directed by its managing member, PMJ and its 100% managing member Paul M. Johannsen and/or K2M and its sole member, Mark D. Kvamme.[120]

These allegations are a reassertion of Maschmedts' prepetition claims against the Debtor and attempt to tag Movants with those claims under a piercing the veil, alter ego, or successor liability theory.

---

benefit of a "free and clear" sale under the bankruptcy code, or the specific language in this Court's Confirmation Order that renders the claims by the Maschmedts against the Plan Funder and other defendants unenforceable.

[119] First Amended Complaint ¶46.

[120] First Amended Complaint ¶47.

Attached to the First Amended Complaint as exhibits, are marketing materials, Maschmedts' Buy Sell, and Association minutes, all of which reflect the prepetition transactions between Debtor and Maschmedts.[121]  This Court cannot ignore the striking similarity between the allegations and causes of action in Claim 2-2, the complaint by the other homeowners attached to Claim 2-2, and the causes of action in the First Amended Complaint, which are dependent on no less than 3 exhibits that involve prepetition representations and conduct by the Debtor.  These similarities irrefutably establish Maschmedts are attempting to circumvent the terms of the Plan and assert causes of action that were released under Article VIII, § A.

Maschmedts' arguments that the First Amended Complaint involves post confirmation claims outside the umbrella of the Plan and Confirmation Order reflects a misunderstanding of the law and the fair contemplation test under *SNTL*.  To conclude Maschmedts did not fairly or reasonably contemplate the claims asserted in the First Amended Complaint both prepetition and certainly during the bankruptcy, this Court would have to ignore the striking similarity between the First Amended Complaint, Claim 2-2, and the complaint by the other homeowners attached to Claim 2-2.

2.  <u>The First Amended Complaint asserts claims against the Debtor that were released.</u>[122]

The assertion that their causes of action are post confirmation claims, or "accrued" post confirmation must be an effort to hedge their bets in the event, this Court determined that Paragraph 35 should be interpreted narrowly and was never intended to be a "complete carve

---

[121] *See* complete copy of First Amended Complaint at ECF No. 217-4.

[122] The First Amended Complaint's inclusion of the Debtor as a defendant raises questions under both bankruptcy and non-bankruptcy law.  For example, what do Maschmedts hope to recover from a defendant with no assets that has been dissolved?

out," of Maschmedts from the Plan and Confirmation Order.[123]  Maschmedts argue that the First

Amended Complaint asserts causes of action that accrued "post confirmation," and seek to

recharacterize their prepetition claims as claims that "accrued" after confirmation.  Maschmedts

make some form of this argument for each cause of action.  For example:

> Maschmedts entered into agreements with Debtor, the predecessor in interest to GFY87, wherein Maschmedts would purchase Property from the Debtor for sums certain and in exchange receive fee ownership of the real property and use of the Amenities. Thus, the Maschmedts breach of contract claim originally arose pre-petition, when the Debtor failed to construct and provide all of the Amenities promised. However, the breach of contract claim did not fully accrue until post-confirmation, when the Maschmedts were denied access to the Amenities already built and existing. Therefore, Counts V and VI did not fully accrue until post-confirmation.

After conceding that these causes of action (breach of contract and breach of the covenant of

good faith and fair dealing) "arose" against the Debtor prepetition, Maschmedts appear to rely on

their counsel's letter as a denial of their right to amenities triggering a post confirmation claim.

This Court is unwilling to construe counsel's letter as transformative of Maschmedts'

claims.  Instead, the law and record suggest counsel's letter was simply a thin veneer applied to

Maschmedts prepetition claims in order to disguise those claims and avoid the narrow reading of

Paragraph 35.  Under *SNTL*, Maschmedts clearly and reasonably contemplated these claims.  The

claims are against the Debtor, and the claims were released.  While the Court's analysis could

stop here, a further look at the specific claims bolsters the Court's conclusions.

---

[123] The Court acknowledges parties are entitled to alternative theories of their case, but if Maschmedts reasonably believed that their prepetition claims were preserved under the Plan and Confirmation Order, and that they were completely carved out of the Plan and Confirmation Order, the contrived argument that their causes of action alleged in the First Amended Complaint accrued post confirmation would be unnecessary.

a.  <u>Breach of Contract</u>.

Maschmedts' First Amended Complaint alleges breach of contract.[124]  Maschmedts'
allege that they entered a Buy-Sell with Debtor, and that the Plan Funder, breached the Buy-Sell
by refusing Maschmedts' access to amenities.  On its face, this is implausible because GFY87
was not a party to the contract in 2007, and GFY87's sole purpose was to acquire assets under
the Plan, "free and clear of claims" as the Plan Funder.  The claim seeks monetary damages.
This claim centers on the alleged representations made by Debtor prepetition, and Maschmedts'
legally untenable claim that the purchase of Lot 1 entitled then to the use of amenities in
perpetuity.  It is a prepetition claim against Debtor that was released and enjoined.[125]

Further, it seeks to graft Debtor's liability for unfulfilled prepetition representations on to
the Plan Funder.  It is inconsistent with and violates paragraphs 9, 10, and 12 of the Confirmation
Order.  The Plan Funder acquired Debtor's assets (which included the Association assets) free
and clear of any and all third-party claims and interests.[126]  Further, all persons and entities "are
forever barred, estopped and permanently enjoined from asserting against the Plan Funder, its
successors, designees or assigns, its property, or the Debtor's assets conveyed in accordance with
the Plan, such persons' or entities' Third Party Claims and Interests.[127]  And, equally important,
the Plan Funder shall not be liable for any Third Party Claims and Interests[128] against or in, or
obligations of, the Debtor or any of the Debtor's predecessors or affiliates, as a result of having
purchased the Debtor's assets."[129]  This claim must be dismissed.

---

[124] Compare Claim 2-2, and allegations at ¶¶ 12-29, and 82-87 of First Amended Complaint.
[125] *See* Articles VIII §§ A, H.
[126] Confirmation Order ⁋ 9
[127] Confirmation Order ⁋ 10
[128] "Third Party Claims and Interests is broadly defined in ⁋P of the Confirmation Order and includes Maschmedts' claims.
[129] Confirmation Order ⁋12.

b.  <u>Breach of the Covenant of Good Faith and Fair Dealing</u>.

This cause of action is asserted against the Debtor and Plan Funder.  This cause of action is related to Maschmedts' breach of contract claim.  It seeks money damages and is predicated on Maschmedts' amenity theory.  To the extent an obligation to provide amenities ever existed, the obligation was exclusively Debtors and any claim was released and enjoined by the Plan.[130] Further this claim also violates paragraphs 9, 10, and 12 of the Confirmation Order.  For the same reasons as the breach of contract claim, this claim was enjoined and must be dismissed.

c.  <u>Negligent Misrepresentation</u>.

This cause of action is asserted against the Debtor, Kvamme and Johannsen.  It seeks money damages and the allegations almost exclusively involve Debtor's prepetition conduct. The alleged acts taken by Kvamme and Johannsen were acts on behalf of the Debtor and give rise to prepetition claims against the Debtor that were released pursuant to the terms of the Plan.[131]  Further to the extent the alleged acts were taken in conjunction with the implementation of the Plan, Kvamme and Johannsen are exculpated parties under the Plan.[132]  This claim was enjoined and must be dismissed.

d.  <u>Negligence</u>.

This cause of action is asserted against Great Northern.  It seeks money damages.  This claim is premised on prepetition conduct of the Debtor.  The claim seeks to impose liability for Debtor's actions on Great Northern.  The alleged acts by Great Northern were acts on behalf of the Debtor, or otherwise implicate Debtor's prepetition conduct.  It is a prepetition claim against

---

[130] *See* Articles VIII §§ A, H.
[131] *Id.*
[132] Articles VIII § G.

the Debtor.  It was released and enjoined pursuant to the terms of the Plan.[133]  It must be dismissed.

      e.   <u>Actual Fraud</u>.

This cause of action is asserted against the Debtor, the Plan Funder, Great Northern, K2M, and Kvamme.  It seeks money damages. The allegations involve Debtor's prepetition conduct.  This count asserts a prepetition claim that was released and enjoined by the Plan.[134] Similar to other claims alleged by Maschmedts in the First Amended Complaint, although the Plan Funder is included as a defendant, the Plan Funder did not even exist when the alleged prepetition acts occurred.  To the extent an obligation to provide amenities ever existed, the obligation was exclusively Debtors and it was released by the Plan.  It also violates paragraphs 9,10, and 12 of the Confirmation Order.  This claim must be dismissed.

      f.   <u>Constructive Fraud.</u>

For the same reasons already articulated for the fraud claim, this claim must be dismissed.

      g.   <u>Unjust Enrichment.</u>

For the same reasons already articulated for the fraud claim, this claim must be dismissed.

      h.   <u>Conversion.</u>

For the same reasons already articulated for the fraud claim, this claim must be dismissed.

      i.   <u>Consumer Protection.</u>

---

[133] *See* Articles VIII §§ A, H.
[134] *See* Articles VIII §§ A, H.

For the same reasons already articulated for the fraud claim, this claim must be dismissed.

      j.   <u>The First Declaratory Judgment Cause of Action</u>.

Like the other claims, Maschmedts' initial declaratory judgment act reflects the assertion of a prepetition claim against the Debtor and Plan Funder based on amenities.  It is a prepetition claim asserted anew, despite being released and enjoined.[135]  It seeks an Order declaring Maschmedts are entitled to amenities in perpetuity.  It boldly requests that Maschmedts be awarded a 45/365 ownership interest in the real property the Plan Funder acquired under the Plan.  The relief sought directly contradicts Paragraphs 9, 10, and 12 of the Confirmation Order.

Maschmedts request entirely ignores that the Plan Funder acquired Debtor's assets free and clear of any and all Third Party Claims and Interests, that parties are enjoined from asserting against the Plan Funder, or the property acquired under the Plan by the Plan Funder Third Party Claims or Interests.  Maschmedts ask the state court to declare and award them a 45/365 ownership interest in the property acquired by the Plan Funder.  Maschmedts are seeking an order from another court that directly contradicts this Court's Confirmation Order.  It must be dismissed.

      k.   <u>The Second Declaratory Judgment Action</u>.

The second declaratory judgment cause of action is even bolder when it alleges the transactions under the Plan were used "to preclude claimants such as Maschmedts from recovering on their claims."  Count II requests the State Court to issue a declaratory judgment that directly contravenes findings in paragraphs K, M, O and Q, of the Confirmation Order, each of which refer to and find that the transactions approved by the Plan were done in good faith and

---

[135] *See* Articles VIII §§ A, H.

an arms-length transaction.  Equally important, the Confirmation Order authorizing the sale of

Debtor's assets to Plan Funder free and clear of creditor claims, including:

> The transactions contemplated in the Plan, including, without limitation, the Plan Funder
> Sale and the Homeowner Property Sales, do not amount to a consolidation, merger or de
> facto merger of the Plan Funder and the Debtor and/or the Debtor's Estate; there is no
> substantial continuity between the Plan Funder and the Debtor; there is no continuity of
> enterprise between the Debtor and the Plan Funder; the Plan Funder is not a mere
> continuation of the Debtor or the Debtor's Estate; and the Plan Funder does not constitute
> a successor to the Debtor or the Debtor's Estate including for purposes of any liabilities .
> . . . . Except as otherwise expressly provided in the documentation effectuating the Plan
> Funder Sale, the Plan Funder's acquisition of the Debtor's assets shall be free and clear of
> any "successor liability" claims of any nature whatsoever, whether known or unknown
> and whether asserted or unasserted as of the time of Closing to the extent permitted by
> applicable law.[136]

This cause of action violates the Plan and Confirmation Order.  Again, the state court is invited

to enter a ruling that is irreconcilable with the Plan and relief afforded under the Confirmation

Order in this case.  It must be dismissed.

l.   Alter Ego and Veil Piercing.

Finally, Maschmedts allege alter ego and veil piercing claims against the Debtor, Plan

Funder and Great Northern.  They allege that the multiple entity structure was used to justify

wrongdoing by permitting entities to transfer assets from one to another.  In this case, the Plan

Funder sale was approved and authorized by this Court.  In their Limited Objection, Maschmedts

did not object to either the Plan Funder sale or the Homeowner's sales.  Like the other claims,

this one was released and enjoined.[137]  It must be dismissed.

---

[136] Confirmation Order ⁋ 17.
[137] *See* Articles VIII §§ A, H.

3.  Taken together the First Amended Complaint represents a cavalier collateral
attack on the Plan and Confirmation Order.

Maschmedts' Limited Objection does not permit the extraordinary collateral attack on the

Plan and Confirmation Order evidenced by the First Amended Complaint.  "Once a bankruptcy

plan is confirmed, it is binding on all parties and all questions that could have been raised

pertaining to the plan are entitled to res judicata effect." *Trulis v. Barton*, 107 F.3d 685, 691 (9th

Cir.1995).  Where a "creditor fails to protect its interests by timely objecting to a plan or

appealing the confirmation order, it cannot later complain about a certain provision contained in

a confirmed plan" by bringing a collateral attack in another court. *In re Pardee*, 193 F.3d 1083,

1086 (9th Cir.1999) (internal quotation marks omitted).

The relief sought in the First Amended Complaint, particularly in the Declaratory

Judgment actions reflects a brazen disregard for this Court's Confirmation Order and the explicit

language found in it.  Although Maschmedts timely objected to the Plan, as already noted, it was

a Limited Objection.  When the entire record of this bankruptcy case is considered in conjunction

with the whole Plan and Confirmation Order, the relief requested in the First Amended

Complaint equates to a collateral attack by Maschmedts on the confirmed Plan.  The Plan's

unequivocal terms collectively provide that the Plan Funder was acquiring property from the

Debtor free and clear of all claims, and that prepetition creditors would neither have recourse

against the Plan Funder, nor the property acquired by the Plan Funder for claims that were

released and enjoined.  Despite the litany of provisions that establish this framework and

otherwise make finality the goal, Maschmedts remain undeterred as evidenced by the First

Amended Complaint.

Taken together the causes of action in the First Amended Complaint seek to set aside a

significant portion of the relief afforded under the Plan and Confirmation.  Prepetition claims

that were released and enjoined would proceed against Movants would be prosecuted. In many cases Maschmedts seek to impose liability on Movants for a cause of action that Maschmedts had against the Debtor. Further, aspects of their claims directly attack the proceedings in this Court and seek to impose liability on Movants solely for implementing the Plan, which is prohibited by the exculpation clause. There is no construction of Maschmedts' Limited Objection, or Paragraph 35 that would permit Maschmedts broad collateral attack on the Plan evidenced by the First Amended Complaint.

## V.  Conclusion

Given this Court's conclusions that, (1) in order to give the Plan and Confirmation Order effect as a whole, Paragraph 35 narrowly protects a limited set of real property interests, and (2) none of the causes of action asserted in the First Amended Complaint may be maintained because they were released, enjoined, or otherwise violate the Plan and Confirmation Order, the Case No. DV-15-1174C pending in Montana's Eleventh Judicial District, Flathead County shall be dismissed in its entirety.

For the reasons discussed above, the Court will enter a separate order requiring Maschmedts to dismiss the pending action.

Dated June 15, 2020.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana